# EXHIBIT A

AIG Property Casualty
Claims Legal

MAR 2 5 2019

**RECEIVED**                    SUMMONS

RECEIVED

MAR 2 2 2019

DMG Legal Services
Personal Service

Attorney(s) _Sandro Polledri, Esq._
Office Address _1037 Raymond Boulevard, Suite 900_
Town, State, Zip Code _Newark, NJ 07102_

Telephone Number _973 735 2742_

Attorney(s) for Plaintiff

_Mercer County Community College_

Plaintiff(s)

vs.

_AIG Claims, Inc._

Defendant(s)

**Superior Court of
New Jersey**

_Mercer_ County

_Law_ Division

Docket No: _417-19_

**CIVIL ACTION
SUMMONS**

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.

_Michelle Smith_
Clerk of the Superior Court

DATED: _3|12|2019_

Name of Defendant to Be Served: _AIG Claims, Inc._

Address of Defendant to Be Served: _175 Water Street, New York, NY 10038_

Revised 11/17/2014, CN 10792-English (Appendix XII-A)

**ADAMS GUTIERREZ & LATTIBOUDERE, LLC**
Sandro Polledri, Esq. (Court ID No.: 038971989)
The Legal Center
1037 Raymond Boulevard, Suite 900
Newark, NJ 07102
Tel. (973) 735-2742 Fax: (973) 735-2743
Attorneys for Plaintiff, Mercer County Community College

| | |
|---|---|
| MERCER COUNTY COMMUNITY COLLEGE,<br>    Plaintiff,<br><br>v.<br><br>AIG CLAIMS, INC.,<br>    Defendant. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MERCER COUNTY<br>DOCKET NO.:<br><br>Civil Action<br>**DECLARATORY JUDGMENT<br>COMPLAINT** |

Plaintiff Mercer County Community College ("Mercer" or the "College"), by and through its counsel, hereby avers and says the following to be true to best of the Plaintiff's knowledge, information and belief, and prays for relief in law and equity:

## STATEMENT OF THE RELIEF REQUESTED

1. Plaintiff seeks a judgment declaring that Defendant AIG Claims, Inc. ("AIG") is obligated to defend and indemnify the College and its administrators in connection with the employment lawsuit in <u>Michael Flaherty v. Mercer County Community College, Monise Princilus and Mark Harris</u>, Docket No. MER-L-000373-18 (the "Civil Action"), which was filed in the Superior Court of New Jersey, Mercer County, by one of its employees for retaliation under the New Jersey Conscientious Employee Protection Act, <u>N.J.S.A.</u> 34:19-1, <u>et seq.</u> ("CEPA").

A
I
G

O
L
0
6
:
s
e
s
s

6
3
/
2
5
/
2
0
1
9

2.  In addition, Plaintiff seeks reimbursement from AIG for the attorney's fees and costs of litigation expended in defense of the Civil Action, and such other relief as the Court may deem to be just, proper and equitable.

### STATEMENT OF JURISDICTION AND VENUE

3.  The Court possesses original, plenary personal jurisdiction over the parties to this matter, and subject matter jurisdiction over the controversies between and among the parties, pursuant to Article VI, Sections One and Three, of the New Jersey Constitution and the Rules Governing the Courts of the State of New Jersey.

4.  The Court also possesses jurisdiction under the Declaratory Judgment Act, N.J.S.A. 2A:16-50 to 62.

5.  Venue is properly laid in Mercer County as the College is located within the County and the Defendant does business in this County.

### THE PARTIES

6.  Plaintiff is a New Jersey public community college with its principal place of business at 1200 Old Trenton Road, West Windsor Township, New Jersey 08550.

7.  Defendant AIG is the claims administrator for claims arising under the insurance policy issued to Mercer by National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), a member underwriting company of AIG Claims, Inc., with its principal place of business at 175 Water Street, New York, New York 10038.

### THE POLICY

8.  National Union issued a comprehensive insurance policy which included an Employment Practices Liability ("EPL") Section, under Policy Number 01-590-20-

2

A
I
G

O
L
0
6
:
s
e
s
6

3
/
2
5
/
2
0
1
9

92, to Mercer as the Insured with a Policy Period effective from July 1, 2017 to July 1, 2018 ("the Policy"). The Policy has a limit of liability of $5,000,000 and a self-insured retention of $50,000 for Employment Practices Claims, and provides coverage to the College as well as its Executives and employees. (The Employment Practices Liability Section is attached hereto as Exhibit A).

9.  The Policy states in relevant part in Clause 1, Insuring Agrements, of the EPL Coverage Section that it covers the Insured for the Loss arising from a Claim against it for any Employment Practices Violations:

> All coverage granted for Loss under this Coverage Section is provided solely with respect to Claims first made against an Insured during the Policy Period or any applicable Discovery Period and reported to the Insurer as required by this Coverage Section, except to the extent coverage is extended pursuant to the *Claims Savings Clause* of the Coverage Section to a Claim first made prior to the Policy Period. Subject to the foregoing and the other terms, conditions and limitations of this policy, this Coverage Section affords the following coverage:
>
> A.  Employment Practices Liability Coverage
>
> This policy shall pay the Loss of each and every Insured arising from a Claim made against such Insured for any Employment Practices Violation.

10. Pursuant to Clause 12, Definitions, of the EPL Coverage Section, "Employment Practices Violation" is defined to include such employment actions as wrongful discharge or termination from employment, harassment and retaliation.

11. Clause 12 defines "Claim" in relevant part as 1) a written demand for monetary, non-monetary or injunctive relief, including, but not limited to, any demand for mediation, arbitration or other alternative dispute resolution process, or any request to toll or waive the statute of any limitations; or 2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is

A
I
G

O
L
0
6
:
s
e
s

6

3
/
2
5
/
2
0
1
9

commenced by: (a) service of a complaint or similar pleading; (b) return of an

indictment, information or similar document (in the case of a criminal proceeding); or

(c) receipt or filing of a notice of charges. court proceeding for money damages which

is commenced by service of a complaint or similar pleading.

12. Clause 3, Exclusions, of the EPL Coverage Section, allows for the exclusion of

coverage in a number of circumstances, including : (2) for claims arising out of prior

litigation, EEOC claims, or facts derived from such litigation or claims, and (3) for

claims arising out of the same or related employment violations contained in a prior

claim made "under any policy providing coverage" for such violations "which was in

force prior to the Inception Date of" the Policy.

13. Clause 5(a), Notice and Reporting, of the EPL Coverage Section – *Reporting a Claim*

– requires in relevant part that the Insured "shall, as a condition precedent to the

obligations of the Insurer under this Coverage Section, notify the Insurer in writing of

a Claim made against an Insured as soon as practicable after" becoming aware of the

Claim, and at a minimum that "notification must be provided no later than sixty (60)

days after the end of the Policy Period or the discovery Period (if applicable)."

14. Clause 5(b), Notice and Reporting, of the EPL Coverage Section – *Relation Back to*

*the First Reported Claim* – provides in relevant part: "Solely for the purpose of

establishing whether any subsequent Related Claim was first made during the Policy

Period or Discovery Period (if applicable), if during any such period a Claim was first

made and reported in accordance with Clause 5(a) above, then any Related Claim that

is subsequently made against an Insured and that is reported in accordance with

A
I
G

O
L
0
6
:
s
e
s
6

3
/
2
5
/
2
0
1
9

Clause 5(a) above shall be deemed to have been first made at the time that such

previously reported Claim was first made."

15. Clause 12, Definitions, provides that a Claim is "Related" to another Claim if it arises

out of or is attributable to "any facts or Wrongful Acts that are the same as or related

to those that were alleged in another Claim made against" the Insured.

**FACTUAL AND PROCEDURAL HISTORY**

16. On or about January 16, 2018, the College received a Demand Letter from the

attorney for Michael Flaherty, the Commanding Officer for College Safety and

Security at Mercer, advising that he intended to file a CEPA lawsuit against the

College on behalf of Flaherty, and attaching a copy of the intended Complaint.

17. Thereafter, on or about February 1, 2018, Flaherty initiated the Civil Action by filing

a complaint in the Mercer County Superior Court against the College, Monise

Princilus, the Executive Director of Human Resources and Compliance, and Dr. Mark

Harris, the Vice President for Finance and Administration. (Exhibit B).

18. It is alleged in the Civil Action that Princilus, with the knowledge and approval of

Harris, forced or coerced Jennifer Goddard, one of Flaherty's subordinate security

officers, to file a sexual harassment complaint against him in February 2017 in

retaliation for protected whistleblowing activity he had allegedly engaged in during

the Fall of 2016, which complaint had an adverse impact on Flaherty's continued

employment with the College.

19. After receiving the required written Notice from the College about the claim asserted

in the Civil Action, AIG issued a disclaimer letter on March 5, 2018 denying

coverage of that employment practices claim.

5

20. The denial was based on the determination pursuant to Clause 5(b) of the EPL
    Coverage Section that the claims asserted in the Civil Action were not covered
    because they were "Related" to criminal complaints that Flaherty had previously filed
    in the West Windsor Municipal Court in or about June 2017 – outside the Policy
    Period – against Princilus and Harris in which Flaherty alleged that Princilus had,
    with the knowledge and approval of Harris, engaged in criminal conduct by
    threatening and coercing Goddard into filing the sexual harassment complaint against
    Flaherty.

21. As a result of those criminal complaints, the Prosecutor's Office issued Summons
    Notices to both Princilus and Harris, and opened a criminal investigation into the
    matter, causing both to retain counsel.

22. The College had provided notice to AIG about those criminal complaints in August
    2017, even though the complaints had been made against Princilus and Harris in June
    2017 prior to the Policy Period of the AIG EPL Policy.

23. By disclaimer letter dated October 3, 2017, AIG denied coverage with respect to the
    criminal complaints because the claims were made prior to the inception of the July
    2017-July 2018 Policy.

24. The criminal action against Dr. Harris was administratively dismissed by the Mercer
    County Prosecutor's Office in August 2017, and by Order dated September 28, 2017,
    all records pertaining to that criminal action were expunged.

25. The criminal action against Ms. Princilus was administratively dismissed in
    November 2017, and by Order dated November 28, 2017, all records pertaining to
    that criminal action were expunged.

26. Mercer's appeal to AIG from the March 5, 2018 disclaimer of coverage of the Civil Action was denied by letter from coverage counsel for AIG dated February 7, 2019. The denial of the appeal was based on the same reasoning as the denial of coverage set forth in the March 5, 2018 disclaimer of coverage: that the Civil Action is a "Related Claim" to the criminal complaints which were made outside the Policy Period.

27. Plaintiff and Defendant are "persons" within the meaning of <u>N.J.S.A.</u> 2A:16-50.

28. The Policy is a "contract" within the meaning of <u>N.J.S.A.</u> 2A:16-53 and 54.

29. Plaintiff asks the Court to declare the rights, status and legal relations between and among the parties with respect to Defendant's obligation to defend and indemnify the College and its administrators under the Policy in connection with the underlying Civil Action, and under any other applicable statute, regulation, ordinance, law or common law rule. <u>See</u> <u>N.J.S.A.</u> 2A:16-52 and 53.

30. With the exception for the possible need for enforcement, the entry of a declaratory judgment will terminate the uncertainty or controversies that gave rise to this proceeding. <u>See</u> <u>N.J.S.A.</u> 2A:16-61.

31. Upon information and belief, all persons who have, or could have, any interest in the Policy have been named in this action pursuant pursuant to <u>N.J.S.A.</u> 2A:16—56.

7

## FIRST COUNT

## DECLARATORY JUDGMENT SHOULD BE ENTERED PURSUANT TO N.J.S.A. 2A:16-15 TO 62 DIRECTING THE DEFENDANT TO DEFEND AND INDEMNIFY THE PLAINTIFF IN CONNECTION WITH THE CIVIL ACTION FILED BY MICHAEL FLAHERTY

32. Plaintiff repeats all of the allegations set forth above as if set forth verbatim and at length herein.

33. Mercer received notice of the employmet retaliation claim made by Flaherty against the College, Princilus and Dr. Haris on or about January 16, 2018.

34. Flaherty filed the CEPA Civil Action in the Superior Court of New Jersey, Mercer County, on or about February 1, 2018.

35. Mercer tendered coverage of the Civil Action to AIG in a timely fashion under Clause 5(a) of the EPL Policy.

36. The employment retaliation claim made by Flaherty against the College, Princilus and Dr. Harris in the Civil Action filed on or about February 1, 2018 under CEPA is an Employment Practices Violation as defined in Clause 12 of the Policy and a Claim made against the Plaintiff within the Policy Period .

37. The employment retaliation claim made by Flaherty against the College, Princilus and Dr. Harris in the Civil Action under CEPA is an Employment Practices Violation for which AIG is obligated to defend and indemnify the College pursuant to Clause 1 (A) of the Insuring Agreements Section of the Policy.

38. The *Relation Back to the First Reported Claim* provision in Clause 5(b), Notice and Reporting, of the EPL Coverage Section of the Policy does not apply to the circumstances concerning the timely reported Flaherty Civil Action because the prior Criminal complaints filed by Flaherty against Princilus and Dr. Harris in June 2017

8

A
I
G

O
L
0
6
:
s
e
s
6

3
/
2
5
/
2
0
1
9

were not losses "arising from a Claim made against an Insured for any Employment Practices Violation" as provided for in Clause 1A., Insuring Agrements, of the EPL Coverage Section of the Policy because the threats and coercion allegedly made by Princilus against Godard are not Employment Practices Violations as defined in Clause 12, Definitions.

39. The *Relation Back to the First Reported Claim* provision in Clause 5(b), Notice and Reporting, of the EPL Coverage Section of the Policy does not apply because the prior Criminal proceedings did not arise from the same facts or from an Employment Practices Violation where the criminal proceedings arose from threats and coercion allegedly made by Princilus against Goddard whereas the Civil Action concerns the alleged imposition of an adverse employment action by the College against Flaherty.

WHEREFORE, Plaintiff Mercer County Community College demands and requests relief as follows:

A.      The entry of a final judgment declaring that the Defendant, AIG Claims, Inc., must defend and indemnify Mercer County Community College, Monise Princilus and Dr. Mark Harris with respect to the Employment Practices Claim asserted under CEPA in the Civil Action filed by Michael Flaherty against them in the Superior Court of New Jersey, Mercer County, to the full extent of the Policy, pursuant to N.J.S.A. 2A:16-50 to -62;

B.      For the defense costs of the expenses and legal fees paid by Plaintiff in connection with the litigation of the Action;

C.      For a reasonable counsel fee pursuant to any pertinent statute or regulation; pursuant to R. 4:42-9(a)(6), and pursuant to the equitable powers of the Court;

A
I
G

O
L
0
6
:
s
e
s
s

6

3
/
2
5
/
2
0
1
9

D.      For costs of suit;

E.      For pre-judgment and post-judgment interest; and

F.      For such other relief as the Court may deem to be proper and equitable, in

the interest of justice.

**SECOND COUNT**

**BREACH OF CONTRACT**

40. Plaintiff repeats all of the allegations set forth above, as if set forth verbatim and at

length herein.

41. Defendant breached the express terms of the Policy by its denial of coverage based on

its improper reading of the *Relation Back to the First Reported Claim* provision in

Clause 5(b), Notice and Reporting, of the EPL Coverage Section of the Policy.

WHEREFORE, Plaintiff Mercer County Community College demands and requests relief

as follows:

A.  The entry of a final judgment declaring that the Defendant, AIG Claims, Inc., must defend

and indemnify Mercer County Community College, Monise Princilus and Dr. Mark Harris

with respect to the Employment Practices Claim asserted under CEPA in the Civil Action

filed by Michael Flaherty against them in the Superior Court of New Jersey, Mercer

County, to the full extent of the Policy, pursuant to N.J.S.A. 2A:16-50 to -62;

B.      For the defense costs of the expenses and legal fees paid by Plaintiff in

connection with the litigation of the Action;

C.      For a reasonable counsel fee pursuant to any pertinent statute or regulation;

pursuant to R. 4:42-9(a)(6), and pursuant to the equitable powers of the Court;

D.      For costs of suit;

10

E.      For pre-judgment and post-judgment interest; and

F.      For such other relief as the Court may deem to be proper and equitable,

in the interest of justice.

## THIRD COUNT

### BREACH OF THE IMPLIED COVENANT OF
### GOOD FAITH AND FAIR DEALING

42. Plaintiff repeats all of the allegations set forth above, as if set forth verbatim and at length herein.

43. By operation of law, the Employment Practices Liability Policy identified in Exhibit A contains an implied covenant of good faith and fair dealing.

44. Defendant had a duty to apply the terms of the Policy in good faith to avoid denial of coverage with respect to an Employment Practices Claim made against the College during the Policy Period, but failed to do so.

45. The failure to provide coverage to a covered claim under the Policy constitutes a willful failure and refusal to provide Plaintiff with the benefit of the bargain set forth in a contract.

46. Defendant's material breach of the implied covenant of good faith and fair dealing has caused the Plaintiff to suffer economic and material harm and will continue to cause the Plaintiff to suffer economic and material harm in connection with the continued litigation of the Civil Action.

WHEREFORE, Plaintiff Mercer County Community College demands and requests relief as follows:

A
I
G

O
L
0
6
:
s
e
s

6

3
/
2
5
/
2
0
1
9

A.     The entry of a final judgment declaring that the Defendant, AIG Claims, Inc., must defend and indemnify Mercer County Community College, Monise Princilus and Dr. Mark Harris with respect to the Employment Practices Claim asserted under CEPA in the Civil Action filed by Michael Flaherty against them in the Superior Court of New Jersey, Mercer County, to the full extent of the Policy, pursuant to N.J.S.A. 2A:16-50 to 62.

B.     For the defense costs of the expenses and legal fees paid by Plaintiff in connection with the litigation of the Action;

C.     For a reasonable counsel fee pursuant to any pertinent statute or regulation, pursuant to R. 4:42—9(a)(6), and pursuant to the equitable powers of the Court;

D.     For costs of suit;

E.     For pre-judgment and post-judgment interest; and

F.     For such other relief as the Court may deem to be proper and equitable, in the interest of justice.

**FOURTH COUNT**

**DEFENDANT ACTED IN BAD FAITH BY READING THE POLICY TO INTENTIONALLY DENY COVERAGE TO A COVERED CLAIM**

47. Plaintiff repeats all of the allegations set forth above, as if set forth verbatim and at length herein.

48. The "Relation Back" provision in Clause 5(b), Notice and Reporting, of the EPL Coverage Section of the Policy, by its terms, applies so as to allow for coverage of claims made "subsequent" to the Policy Period – after it has ended – that are related to

A
I
G

O
L
0
6
:
s
e
s
s

6
3
/
2
5
/
2
0
1
9

claims made within the Policy Period, rather than as an exclusion of claims made prior to the inception of the Policy Period.

49. Clause 3, Exclusions, of the EPL Coverage Section provides in paragraphs 2 and 3 for exclusion of claims which arise out of or are related to the facts in a pending or prior litigation, or as to which there was prior notice within the covered period of a policy. This provision does **not** include an exclusion for claims asserted that relate back to a claim made prior to the inception of the Policy.

50. Defendant knowingly, intentionally and in bad faith applied the terms of the "Relation Back" provision in Clause 5(b), Notice and Reporting, of the EPL Coverage Section of the Policy contrary to its plain meaning so as to deny coverage of a covered claim made during the Policy Period as if the "Relation Back" provision was an Exclusion.

51. The criminal act that was the subject of the Criminal proceedings concerned conduct in the form of threats or coercion allegedly taken by Princilus against Goddard, which acts are not Employment Practices Violations as defined in Clause 12 of the Policy, whereas the retaliation that is the subject of the Civil Action concerns the imposition of an adverse employment action allegedly taken by the College against Flaherty.

52. Defendant knowingly, intentionally and in bad faith applied the terms of the "Relation Back" definition in Clause 5(b), Notice and Reporting, of the EPL Coverage Section of the Policy contrary to its plain meaning so as to deny coverage of a covered claim concerning an Employment Practices Violation made during the Policy Period.

53. The Civil Action filed by Flaherty is not a "Related Claim" to the criminal procedings within the meaning of Clause 12, Definitions, of the EPL Coverage Section of the Policy because the criminal proceedings reflect the actions taken by the Prosecutor's

Office to investigate claims of alleged criminal conduct, consisting of coercion and threats against Goddard, which are not employment practices as defined under Clause 12, Definitions, of the EPL Coverage Section, and which are not, therefore, related to the claim asserted in the Civil Action for retaliation against Flaherty with respect to his terms and conditions of employment.

54. The Criminal proceedings were not related to the Civil Action because they did not involve Employment Practices Violations as defined in Clause 12, Definitions, of the EPL Coverage Section of the Policy, but instead concerned acts of threats and coercion allegedly taken against Goddard.

WHEREFORE, Plaintiff Mercer County Community College demands and requests relief as follows:

A.     The entry of a final judgment declaring that the Defendant, AIG Claims, Inc., must defend and indemnify Mercer County Community College, Monise Princilus and Dr. Mark Harris with respect to the Employment Practices Claim asserted under CEPA in the Civil Action filed by Michael Flaherty against them in the Superior Court of New Jersey, Mercer County, to the full extent of the Policy, pursuant to N.J.S.A. 2A:16-50 to 62.

B.     For the defense costs of the expenses and legal fees paid by Plaintiff in connection with the litigation of the Action;

C.     For punitive damages;

D.     For a reasonable counsel fee pursuant to any pertinent statute or regulation, pursuant to R. 4:42-9(a)(6), and pursuant to the equitable powers of the Court;

E.     For costs of suit;

F.     For pre-judgment and post- judgment interest; and

G.     For such other relief as the Court may deem to be proper and equitable, in

the interest of justice.


**ADAMS GUTIERREZ & LATTIBOUDERE, LLC**
Attorneys for Plaintiff, Mercer County Community College


By:     */s/ Sandro Polledri*
        SANDRO POLLEDRI, ESQ.

Dated: February 28, 2019

A
I
G

O
L
0
6
:
s
e
s

6
3
/
2
5
/
2
0
1
9

## RULE 4:5-1 AND RULE 1:38-7 b CERTIFICATIONS

1.  Sandro Polledri, Esq., an attorney at law of the State of New Jersey, to the best of my knowledge, information and belief, hereby certifies the following to be true, and, upon my oath, depose and say:

2.  There are no other civil actions or arbitrations pending in any other Court or forum, between these parties.

3.  The Plaintiff does not anticipate filing any other such civil actions.

4.  There are no other parties to this action that the Plaintiff believes should be joined.

5.  I certify that confidential personal identifiers have been redacted from documents now submitted to the Court, and will be redacted from all documents submitted in the future in accordance with Rule 1: 38-7 (b).

6.  I certify that the foregoing statements made by me are true to the best of my knowledge, information and belief I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.


/s/ Sandro Polledri
SANDRO POLLEDRI, ESQ.

Dated: February 28, 2019

## DESIGNATION OF TRIAL COUNSEL

The undersigned is designated as trial counsel in this matter.

**ADAMS GUTIERREZ & LATTIBOUDERE, LLC**
Attorneys for Plaintiff, Mercer County Community College

By:    */s/ Sandro Polledri*
       SANDRO POLLEDRI, ESQ.

Dated: February 28, 2019

17



| | |
|---|---|
| Cherie Lee Adams | Adam S. Herman |
| Derlys Maria Gutierrez | Andrew B. Brown |
| Perry L. Lattiboudere | Audra A. Pondish |
| Sandro Polledri | William J. Volonte |
| Jerrold J. Wohlgemuth | Leslie F. Prentice |
| John E. Croot, Jr. | David Kalisky |

**THE LEGAL CENTER**
1037 Raymond Blvd.,
Suite 900
Newark, NJ 07102
973.735.2742

**MARLTON OFFICE**
10000 Lincoln Drive East
Suite 201
Marlton, NJ 08053
856.988.5488

March 11, 2019

**VIA ECOURTS**
Clerk
Superior Court of New Jersey
Mercer County
175 S Broad Street
Trenton, NJ 08608

> Re:   *Mercer County Community College v. AIG Claims, Inc.*
> *Docket No.: MER-L-417-19*

Dear Sir/Madam:

This firm represents Plaintiff, Mercer County Community College in the above-referenced matter, which was initiated on February 28, 2019.  Enclosed for filing please find Exhibits A-B to the Complaint, which were inadvertently omitted at the time of filing.

Thank you for your courtesies.

Very truly yours,

*/s/ Sandro Polledri*
Sandro Polledri, Esq.

SP/jh

# EXHIBIT "A"



## EMPLOYMENT EDGE® EMPLOYMENT PRACTICES LIABILITY

### ("EPL Coverage Section")

**Notice:** Pursuant to Clause 1 of the **General Terms and Conditions**, the **General Terms and Conditions** are incorporated by reference into, made a part of, and are expressly applicable to this **EPL Coverage Section**, unless otherwise explicitly stated to the contrary in this **EPL Coverage Section**.

In consideration of the payment of the premium, and each of their respective rights and obligations in this policy, the **Insureds** and the **Insurer** agree as follows:

## 1. INSURING AGREEMENTS

All coverage granted for **Loss** under this **Coverage Section** is provided solely with respect to **Claims** first made against an **Insured** during the **Policy Period** or any applicable **Discovery Period** and reported to the **Insurer** as required by this **Coverage Section**, except to the extent coverage is extended pursuant to the *Claims Savings Clause* of this **Coverage Section** to a **Claim** first made prior to the **Policy Period**. Subject to the foregoing and the other terms, conditions and limitations of this policy, this **Coverage Section** affords the following coverage:

*A. Employment Practices Liability Coverage*

This policy shall pay the **Loss** of each and every **Insured** arising from a **Claim** made against such **Insured** for any **Employment Practices Violation**.

*B. Third Party Violation Coverage*

This policy shall pay the **Loss** of each and every **Insured** arising from a **Claim** made against such **Insured** for any **Third Party Violation**.

*C. Wrongful Internet Activity Coverage*

This policy shall pay the **Loss** of an **Organization** arising from any **Claim** made against such **Organization** for its actual or alleged liability for any **Wrongful Internet Activity** of an **Employee**.

## 2. EXTENSIONS

*A. First Dollar E-Discovery Consultant Services*

For any **Class Action Claim**, no Retention shall apply to the first $25,000 in **Defense Costs** incurred as **E-Discovery Consultant Services**.

*B. Global Liberalization*

For **Loss** from that portion of any **Claim** maintained in a **Foreign Jurisdiction** or to which the law of a **Foreign Jurisdiction** is applied, the **Insurer** shall apply the terms and conditions of this **Coverage Section** as amended to include those of the **Foreign Policy** in the **Foreign Jurisdiction**

A
I
G

O
L
0
6
:
s
e
s
s

6
3
/
2
5
/
2
0
1
9

that are more favorable to **Insureds** in the **Foreign Jurisdiction**. This *Global Liberalization Clause* shall not apply to any provision of any policy that has worldwide effect, including but not limited to any provision addressing limits of liability (primary, excess or sublimits), retentions, other insurance, non-renewal, duty to defend, defense within or outside limits, taxes, conformance to law or excess liability coverage, any claims made provisions, and any endorsement to this policy that excludes or limits coverage for specific events or litigation or that specifically states that it will have worldwide effect.

## 3. EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

| | | |
|---|---|---|
| (1) | *Conduct* | arising out of, based upon or attributable to any deliberate criminal or deliberate fraudulent act by the **Insured** if established by any final, non-appealable adjudication in any action or proceeding other than an action or proceeding initiated by the **Insurer** to determine coverage under the policy; provided, however, the **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of this exclusion; |
| (2) | *Pending & Prior Litigation* | alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (a) litigation; or (b) **EEOC** proceeding or investigation of which any **Insured** had notice; or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or proceeding or investigation; |
| (3) | *Prior Notice* | alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related **Wrongful Act** alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy providing coverage in whole or in part for **Wrongful Acts** which was in force prior to the **Inception Date** of this policy; |
| (4) | *Bodily Injury & Property Damage* | for bodily injury (other than emotional distress or mental anguish), sickness, disease, or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; |
| (5) | *ERISA* | for any violation of responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974 (ERISA), as amended, or any similar provisions of any state, local or foreign statutory or common law; |
| (6) | *Compensation & Labor Liability* | (a) for any violation of responsibilities, obligations or duties imposed by the Fair Labor Standards Act (except the Equal Pay Act) (FLSA), the National Labor Relations Act (NLRA), the Worker Adjustment and Retraining Notification (WARN) Act, the Consolidated Omnibus Budget Reconciliation Act (COBRA), the Occupational Safety and Health Act (OSHA), any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign law or amendment to a law; or |

A
I
G

O
L
0
6
:
s
e
s
s

6
3
/
2
5
/
2
0
1
9

     (b) alleging, arising out of, based upon or attributable to any of the circumstances described in any of the following:

        (i) the refusal, failure or inability of any **Insured** to pay wages or overtime pay (or amounts representing such wages or overtime pay) for services rendered or time spent in connection with work related activities (as opposed to tort-based back pay or front pay damages for torts other than conversion);

        (ii) improper deductions from pay taken by any **Insured** from any **Employee** or purported **Employee**; or

        (iii) failure to provide or enforce legally required meal or rest break periods;

     provided, however, the foregoing Exclusions 6(a) and 6(b) shall not apply to the extent that a **Claim** is for **Retaliation**;

| | | |
|---|---|---|
| (7) | *Benefits* | for any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided, however, this exclusion shall not apply to the extent that a **Claim** is for **Retaliation**; |
| (8) | *Contract* | alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of an **Insured** under any express contract or agreement; provided, however, that this exclusion shall not apply to: |

        (i) liability which would have attached in the absence of such express contract or agreement; or

        (ii) **Loss** constituting **Defense Costs**; or

| | | |
|---|---|---|
| (9) | *Securities Claim* | alleging, arising out of, based upon or attributable to any **Claim** brought by any holder of securities representing the debt or equity of the **Organization** or an **Outside Entity**, in their capacity as such, whether directly, derivatively on behalf of the **Organization** or **Outside Entity**. |

## 4.  RETENTION

In addition to the provisions in Clause 2. RETENTION of the General Terms and Conditions, in no event shall a Retention be applied to the first $25,000 in **Defense Costs** incurred as E-Discovery Consultant Services.

If an **Organization** is unable to advance, pay or indemnify covered **Loss** of an **Insured Person** within the applicable Retention amount due to **Financial Insolvency**, then the **Insurer** shall advance such amounts on behalf of the **Insured Person** until either: (i) an **Organization** has agreed to make such payments, or (ii) the Retention has been satisfied.  In no event shall any such advancement by the **Insurer** relieve any **Organization** of any duty it may have to provide advancement, payment or indemnification to any **Insured Person**.  The **Insurer** shall be entitled to recover the amount of **Loss** advanced within the Retention from the **Organization** pursuant to the subrogation provisions of this **Coverage Section**.

115486 (6/13)             3 of 17      © American International Group, Inc.  All rights reserved.

A
I
G

O
L
0
6
:
s
s
s
6
3
/
2
5
/
2
0
1
9

## 5. NOTICE AND REPORTING

Notice hereunder shall be given in writing to the **Insurer** at the **Claims Address** indicated in the Declarations. If mailed or transmitted by electronic mail, the date of such mailing or transmission shall constitute the date that such notice was given and proof of mailing or transmission shall be sufficient proof of notice.

(a) *Reporting a Claim*   An **Organization** or an **Insured** shall, as a condition precedent to the obligations of the **Insurer** under this **Coverage Section**, notify the **Insurer** in writing of a **Claim** made against an **Insured** as soon as practicable after the **Named Entity's** Human Resources Manager, Risk Manager or General Counsel (or equivalent position) first becomes aware of the **Claim**. In all events, notification must be provided no later than sixty (60) days after the end of the **Policy Period** or the **Discovery Period** (if applicable).

(b) *Relation Back to the First Reported Claim*   Solely for the purpose of establishing whether any subsequent **Related Claim** was first made during the **Policy Period** or **Discovery Period** (if applicable), if during any such period a **Claim** was first made and reported in accordance with Clause 5(a) above, then any **Related Claim** that is subsequently made against an **Insured** and that is reported in accordance with Clause 5(a) above shall be deemed to have been first made at the time that such previously reported **Claim** was first made.

With respect to any subsequent **Related Claim**, this policy shall not cover **Loss** incurred before such subsequent **Related Claim** is actually made against an **Insured** and reported to the **Insurer**.

(c) *Claims Savings Clause*   1. Notwithstanding Clause 5(b), with respect to any **Claim** which (i) first becomes a **Litigated Matter** during the **Policy Period** or **Discovery Period** (if applicable); and (ii) is a **Related Claim** with respect to an **Administrative Claim** which was first made against an **Insured** prior to the **Policy Period**, the **Insurer** shall not deny coverage for such **Claim** based upon late notice of such **Claim** or based upon such **Claim** first being made prior to the **Policy Period**, provided that:

(a) the **Claim** was first made against the **Insured** at a time during which the **Named Entity** was insured under a **Prior AIG Policy**;

(b) upon the **Claim** first becoming a **Litigated Matter**, the **Claim** was reported in accordance with Clause 5(a) above; and

(c) no **Insured** has made a monetary settlement offer to a claimant or responded to a monetary demand from or on behalf of a claimant with respect to such **Claim**.

2. Coverage under this **Coverage Section** for any **Claim** afforded coverage  pursuant to this Clause 5(c) shall be the lesser of:

EPL COVERAGE SECTION

A
I
G

O
L
0
6
:
S
e
s
s

6
3
/
2
5
/
2
0
1
9

(a) the coverage which would have been provided under this **Coverage Section** for such **Claim** had the **Claim** been made during the **Policy Period** and reported to the **Insurer** as required by this **Coverage Section**;  or

(b) the coverage, if any, which would have been provided under the **Prior AIG Policy** for such **Claim** if the **Insured** had properly provided notice of such **Claim** in accordance with the provisions of the **Prior AIG Policy**,

taking into account all provisions of each policy, including, without limitation, applicable limits of liability (as reduced by payments made under such policy), retentions, exclusions and other restrictions contained in each policy.

Notwithstanding the foregoing, nothing in this Clause 5(c) shall be construed to increase the **Limits of Liability** of this policy or to provide coverage under the **Prior AIG Policy**, nor shall this Clause 5(c) ever result in providing coverage under this policy for **Loss** for which coverage is in fact provided (or would be provided but for the exhaustion of the limit of liability) under the **Prior AIG Policy**.

3. This Clause 5(c) shall not apply to any **Claim** which:

(a) prior to the **Policy Period** was a **Litigated Matter**; or

(b) is a **Related Claim** with respect to a **Claim** which prior to the **Policy Period** was a **Litigated Matter**.

(d) *Relation Back to Reported Circumstances Which May Give Rise to a Claim*

If during the **Policy Period** or **Discovery Period** (if applicable) an **Organization** or an **Insured Person** becomes aware of and notifies the **Insurer** in writing of circumstances that may give rise to a **Claim** being made against an **Insured** and provides details as required below, then any **Claim** that is subsequently made against an **Insured** that arises from such circumstances and that is reported in accordance with Clause 5(a) above shall be deemed to have been first made at the time of the notification of circumstances for the purpose of establishing whether such subsequent **Claim** was first made during the **Policy Period** or during the **Discovery Period** (if applicable).  Coverage for **Loss** arising from any such subsequent **Claim** shall only apply to **Loss** incurred after that subsequent **Claim** is actually made against an **Insured** and reported to the **Insurer**.  In order to be effective, notification of circumstances must specify the facts, circumstances, nature of the alleged **Wrongful Act** anticipated and reasons for anticipating such **Claim**, with full particulars as to dates, persons and entities involved.

## 6. DISCOVERY PREMIUM

In the event the **Named Entity** or the **Insurer** shall cancel or refuse to renew this **Coverage Section**, the **Additional Premium Amount** for: (a) one year shall be no more than 125% of the **Full Annual Premium**; and (b) two to six years shall be an amount to be determined by the **Insurer**. As used herein, "**Full Annual Premium**" means the premium level in effect for this **Coverage Section** immediately prior to the end of the **Policy Period**.

In the event of a **Transaction**, the **Additional Premium Amount** shall be an amount to be determined by the **Insurer**.

## 7. DEFENSE AND SETTLEMENT

### A. For Claims

(1) *No Duty to Defend* — The **Insureds** shall defend and contest any **Claim** made against them. The **Insurer** does not assume any duty to defend.

(2) *Right to Tender Defense* — Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of any **Claim** to the **Insurer**, which right shall be exercised in writing by the **Named Entity** on behalf of all **Insureds**. This right shall terminate if not exercised within thirty (30) days of the date the **Claim** is first made against an **Insured**. Further, from the date the **Claim** is first made against the **Insureds** to the date when the **Insurer** accepts the tender of the defense of such **Claim**, the **Insureds** shall take no action, or fail to take any required action, *that prejudices the rights of the* **Insureds** *or the* **Insurer** with respect to such **Claim**. Provided that the **Insureds** have complied with the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false or fraudulent. The assumption of the defense of the **Claim** shall be effective upon written confirmation thereof sent by the **Insurer** to the **Named Entity**. Once the defense has been so tendered, the **Insured** shall have the right to effectively associate with the **Insurer** in the defense and the negotiation of any settlement of any **Claim**. However, the **Insurer** shall not be obligated to defend such **Claim** after the **Policy Aggregate** or any applicable **Separate Limit of Liability** or **Shared Limit of Liability** has been exhausted, or after an **Insured**'s rejection (or failure or refusal to accept within the time prescribed in the "Settlement Opportunity" paragraph of this Clause 7) of a **Settlement Opportunity**.

115486 (6/13)

6 of 17    © American International Group, Inc.  All rights reserved.

EPL COVERAGE SECTION

A
I
G

O
L
0
6
:
S
e
s
s

6
3
/
2
5
/
2
0
1
9

(3) *Advancement*

When the **Insurer** has not assumed the defense of a **Claim** pursuant to subparagraph (2) of this Clause 7, it shall advance, excess of any applicable Retention, covered **Defense Costs** on a current basis, but no later than ninety (90) days after the **Insurer** has received itemized bills for those **Defense Costs**. Such advance payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured Person** or **Organization,** severally according to their respective interests, in the event and to the extent that any such **Insured Person** or **Organization** shall not be entitled under this **Coverage Section** to payment of such **Loss**.

(4) *Claims Participation and Cooperation*

When the **Insurer** has not assumed the defense of a **Claim** pursuant to subparagraph (2) of this Clause 7, the **Insurer** shall have the right, but not the obligation, to fully and effectively associate with each and every **Insured** in the defense and prosecution of any **Claim** that involves, or appears reasonably likely to involve the **Insurer**, including, but not limited to, negotiating a settlement. Each and every **Insured** shall give the **Insurer** full cooperation and such information as it may reasonably require.

The failure of any **Insured Person** to give the **Insurer** cooperation and information as required in the preceding paragraph shall not impair the rights of any other **Insured Person** under this **Coverage Section**.

The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment or incur any **Defense Costs**, without the prior written consent of the **Insurer**. Such consent shall not be unreasonably withheld.

(5) *Full Settlement Within Retention/ Consent Waived*

If all **Insured** defendants are able to dispose of all **Claims** which are subject to one Retention (inclusive of **Defense Costs**) for an amount not exceeding the Retention, then the **Insurer's** consent shall not be required for such disposition.

(6) *Settlement Opportunity*

In the event the **Insureds** do not consent to the first **Settlement Opportunity** within thirty (30) days of the date the **Insureds** are first made aware of the **Settlement Opportunity** (or in the case of a **Settlement Opportunity** which arises from a settlement offer by the claimant, then within the time permitted by the claimant to accept such settlement offer, but in all events no later than thirty (30) days after the settlement offer was made), then the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed: (a) the amount for which the **Insurer** could have settled such **Claim** plus **Defense Costs** incurred as of the date such settlement was proposed in writing by the **Insurer** ("**Settlement Opportunity Amount**"), plus (b) 70% of covered **Loss** in excess of such **Settlement Opportunity Amount**, it being a condition of this insurance that the remaining 30% of such **Loss** excess of the **Settlement Opportunity Amount** shall be carried by the

7 of 17      © American International Group, Inc.  All rights reserved.

EPL COVERAGE SECTION

A
I
G

O
L
0
6
:
s
e
s
s

6
3
/
2
5
/
2
0
1
9

**Organization** and the **Insureds** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply unless the **Settlement Opportunity Amount** exceeds the remaining applicable Retention amount.

## B. Pre-Authorized Defense Attorneys For Designated Employment Practices Claims

The list of approved panel counsel law firms ("**Panel Counsel**") is accessible through the online directory at http://www.aig.com/us/panelcounseldirectory under the "Public and Private Companies (Employment Practices Liability)" link. The list provides a choice of law firms from which a selection of legal counsel shall be made by the **Insureds** (or, in the event the **Insurer** has assumed the defense pursuant to Clause 7.A(2) of this **Coverage Section**, the **Insurer**) to conduct the defense of any **Designated Employment Practices Claim** made against the **Insureds**.

With the express prior written consent of the **Insurer**, an **Insured** may select a **Panel Counsel** different from that selected by another **Insured** defendant if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable. The list of **Panel Counsel** may be amended from time to time by the **Insurer**. However, if a firm is removed from the list during the **Policy Period**, the **Insureds** shall be entitled to select such firm to conduct the defense of any **Designated Employment Practices Claim** made against such **Insureds** during the **Policy Period**.

The **Insureds** (or, in the event the **Insurer** has assumed the defense pursuant to Clause 7.A of this **Coverage Section**, the **Insurer**) shall select a **Panel Counsel** to defend the **Designated Employment Practices Claim** made against the **Insureds** in the jurisdiction in which the **Designated Employment Practices Claim** is brought. In the event the **Claim** is brought in a jurisdiction not included on the list, **Panel Counsel** shall be selected in the listed jurisdiction which is the nearest geographic jurisdiction to either where the **Designated Employment Practices Claim** is brought or where the corporate headquarters of the **Named Entity** is located. In such instance the **Insureds** also may, with the express prior written consent of the **Insurer**, which consent shall not be unreasonably withheld, select a non-**Panel Counsel** in the jurisdiction in which the **Designated Employment Practices Claim** is brought to function as "local counsel" on the **Claim** to assist the **Panel Counsel** which will function as "lead counsel" in conducting the defense of the **Designated Employment Practices Claim**.

## C. Pre-Approved E-Consultant Firms

The list of pre-approved **E-Consultant Firms** is accessible through the online directory at http://www.aig.com/us/panelcounseldirectory under the "e-Consultant Panel Members" link. The list provides the **Insureds** with a choice of firms from which a selection of an **E-Consultant Firm** shall be made. Any **E-Consultant Firm** may be hired by an **Insured** to perform **E-Discovery Consultant Services** without further approval by the **Insurer**.

# 8. SUBSIDIARY COVERAGE

## A. Subsidiary Additions

In addition to the definition of "**Subsidiary**" set forth in Clause 12. DEFINITIONS of this **Coverage Section**, **Subsidiary** also means any for-profit entity: (1) of which the **Named Entity** first had **Management Control** during the **Policy Period**, whether directly or indirectly through one or more other **Subsidiaries**; and (2) whose:

(a) total number of **Employees** is less than the lesser of: (i) 20% of the total **Employees** of each and every **Organization** as of the **Inception Date** of this policy; or (ii) five hundred (500); or

A
I
G

O
L
0
6
:
s
e
s
s

6
3
/
2
5
/
2
0
1
9

(b) total number of **Employees** does not satisfy the criteria set forth in subparagraph (a), above, but such entity shall be a "**Subsidiary**" only: (i) for a period of sixty (60) days from the date the **Named Entity** first had **Management Control** of such entity; or (ii) until the end of the **Policy Period**, whichever expires or ends first (the "**Auto-Subsidiary Period**");

provided that, with respect only to entities described in subparagraph (b) above, the **Named Entity** or any other **Insured** shall report such **Subsidiary** to the **Insurer**, in writing, prior to the end of the **Policy Period**.

The **Insurer** shall extend coverage for any **Subsidiary** described in subparagraph (b) above, and any **Insured Person** thereof, beyond its respective **Auto-Subsidiary Period** if during such **Auto-Subsidiary Period**, the **Named Entity** shall have provided the **Insurer** with full particulars of the new **Subsidiary** and agreed to any additional premium and amendment of the provisions of this policy required by the **Insurer** relating to such **Subsidiary**. Further, coverage as shall be afforded to any **Subsidiary** and any **Insured Person** thereof is conditioned upon the **Named Entity** paying when due any additional premium required by the **Insurer** relating to such **Subsidiary**.

### B. Former Subsidiaries

In the event the **Named Entity** loses **Management Control** of a **Subsidiary** during or prior to the **Policy Period**, coverage with respect to such **Subsidiary** and its **Insured Persons** shall continue until termination of this policy but only with respect to **Claims** for **Wrongful Acts** that occurred or are alleged to have occurred during the time that the **Named Entity** had **Management Control** of such entity either directly or indirectly through one or more of its **Subsidiaries**.

### C. Scope Of Subsidiary Coverage

Coverage as is afforded under this **Coverage Section** with respect to a **Claim** made against any **Subsidiary** and/or any **Insured Person** thereof shall only apply for **Wrongful Acts** committed or allegedly committed during the time that such **Subsidiary** and such **Insured Person** meet the respective definitions of **Subsidiary** and **Insured Person** set forth in this **Coverage Section**.

## 9. APPLICATION AND UNDERWRITING

### A. Application And Reliance

The **Insurer** has relied upon the accuracy and completeness of the statements, warranties and representations contained in the **Application**. All such statements, warranties and representations are the basis for this **Coverage Section** and are to be considered as incorporated into this **Coverage Section**.

### B. Severability Of The Application

The **Application** shall be construed as a separate application for coverage by each **Insured Person**. With respect to the **Application**, no knowledge possessed by any **Organization** or any **Insured Person** shall be imputed to any other **Insured Person**.

If the statements, warranties and representations in the **Application** were not accurate and complete and materially affected either the acceptance of the risk or the hazard assumed by the **Insurer** under this **Coverage Section**, then the **Insurer** shall have the right to void coverage under this **Coverage Section**, *ab initio*, with respect to:

(1) **Loss** of any **Insured Person** who knew, as of the inception date of the **Policy Period**, the facts

A
I
G

O
L
0
6
:
s
e
s
s

6
3
/
2
5
/
2
0
1
9

that were not accurately and completely disclosed; and

(2) **Loss** of an **Organization**, if any **Insured Person** who is or was a chief executive officer, general counsel, director of human resources or risk manager (or equivalent position) of the **Named Entity** knew, as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed.

The foregoing applies even if the **Insured Person** did not know that such incomplete or inaccurate disclosure had been provided to the **Insurer** or included within the **Application**.

## 10. PAYMENTS AND OBLIGATIONS OF ORGANIZATIONS AND OTHERS

### A. Other Insurance And Indemnification

Unless expressly written to be excess over other applicable insurance, it is intended that the insurance provided by this **Coverage Section** shall be primary.

In the event a **Claim** is made against an **Outside Entity Executive**, or a **Claim** is made against an **Insured** for the **Insured's** liability with respect to a leased **Employee** or independent contractor **Employee** as described in the definition of "**Employee**", coverage as is afforded by this **Coverage Section** shall be specifically excess of any: (a) indemnification provided by such **Outside Entity** or leasing company; and (b) any other insurance provided to such **Outside Entity**, leasing company or independent contractor.

### B. Subrogation

To the extent of any payment under this **Coverage Section**, the **Insurer** shall be subrogated to all of the **Organizations'** and **Insureds'** rights of recovery. Each **Organization** and each **Insured Person** shall execute all papers reasonably required and provide reasonable assistance and cooperation in securing or enabling the **Insurer** to exercise subrogation rights or any other rights, directly or in the name of the **Organization** or any **Insured Person**.

In the event that the **Insurer** shall for any reason pay **Loss** on behalf of an **Insured Person**, the **Insurer's** subrogation rights shall include, but not be limited to, the assertion of indemnification or contribution rights with respect to any such payments it makes or advances. Additionally, upon the **Insurer** making any payment of **Loss** within the Retention on behalf of any **Insured**, the **Insurer** shall have a direct contractual right under this policy to recover from the **Organization**, or in the event of the bankruptcy of the **Organization**, from the debtor-in-possession (or equivalent status outside the United States) such **Loss** which was paid within the Retention. Such direct contractual right of recovery against the **Organization** shall be in addition to and independent of the **Insurer's** subrogation right pursuant to this Clause 10.B and any other rights the **Insurer** may have under applicable law.

In no event, however, shall the **Insurer** exercise its rights of subrogation against an **Insured** under this **Coverage Section** unless the Conduct Exclusion applies with regard to such **Insured**; provided, however, this sentence shall not apply to subrogation against the **Organization** as described in the second paragraph of this Clause 10.B.

A
I
G

O
L
0
6
:
s
e
s

6
3
/
2
5
/
2
0
1
9

# 11. ALTERNATIVE DISPUTE RESOLUTION

*ADR Options*

All disputes or differences which may arise under or in connection with this **Coverage Section**, whether arising before or after termination of this policy, including any determination of the amount of **Loss**, shall be submitted to an alternative dispute resolution (ADR) process as provided in this Clause. The **Named Entity** may elect the type of ADR process discussed below; provided, however, that absent a timely election, the **Insurer** may elect the type of ADR. In that case, the **Named Entity** shall have the right to reject the **Insurer's** choice of the type of ADR process at any time prior to its commencement, after which, the **Insured's** choice of ADR shall control.

*Mediation*

In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have *been terminated and at least ninety (90) days shall have elapsed from* the date of the termination of the mediation.

*Arbitration*

In the event of arbitration, the decision of the arbitrator(s) shall be final, binding and provided to both parties, and the arbitration award shall not include attorney's fees or other costs.

*ADR Process*

*Selection of Arbitrator(s) or Mediator*: The **Insurer** and the **Named Entity** shall mutually consent to: (i) in the case of arbitration, an odd number of arbitrators which shall constitute the arbitration panel, or (ii) in the case of mediation, a single mediator. The arbitrator, arbitration panel members or mediator must be disinterested and have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. In the absence of agreement, the **Insurer** and the **Named Entity** each shall select one arbitrator, the two arbitrators shall select a third arbitrator, and the panel shall then determine applicable procedural rules.

*ADR Rules*: In considering the construction or interpretation of the provisions of this policy, the mediator or arbitrator(s) must give due consideration to the general principles of the law of the **State of Formation** of the **Named Entity**. Each party shall share equally the expenses of the process elected. At the election of the **Named Entity**, either choice of ADR process shall be commenced in New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state reflected in the **Named Entity Address**. The **Named Entity** shall act on behalf of each and every **Insured** under this *Alternative Dispute Resolution Clause*. In all other respects, the **Insurer** and the **Named Entity** shall mutually agree to the procedural rules for the mediation or arbitration. In the absence of such an agreement, after reasonable diligence, the arbitrator(s) or mediator shall specify commercially reasonable rules.

A
I
G

O
L
0
6
:
s
e
s

6
3
/
2
5
/
2
0
1
9

## 12. DEFINITIONS

The following definitions shall apply only for purposes of coverage provided under this **Coverage Section**.  Terms appearing in **bold** in this **Coverage Section** but not defined herein shall have the meaning and/or value ascribed to them in the Declarations or in the *Definitions Clause* of the **General Terms and Conditions.**

| | |
|---|---|
| **Administrative Claim** | means an administrative or regulatory investigation: |
| | (1) by the **EEOC**; or |
| | (2) of a violation of the Uniformed Services Employment and Reemployment Rights Act, when such investigation is conducted by the United States Department of Labor, Veterans Employment and Training Service, Justice Department or Office of Special Counsel; |
| | which, in either case, is commenced by the filing of a notice of charges or similar document of which notice has been given to an **Insured**. |
| | The term **"Administrative Claim"** shall not mean or include any **Litigated Matter**. |
| **Application** | means: |
| | (1) the written statements and representations made by an **Insured** and provided to the **Insurer** during the negotiation of this policy, or contained in any application or other materials or information provided to the **Insurer** in connection with the underwriting of this policy; and |
| | (2) all warranties executed by or on behalf of an **Insured** and provided to the **Insurer** in connection with the underwriting of this policy or the underwriting of any other employment practices (or equivalent) liability policy issued by the **Insurer**, or any of its affiliates, of which this policy is a renewal, replacement or which it succeeds in time. |
| **Claim** | means: |
| | (1) a written demand for monetary, non-monetary or injunctive relief, including, but not limited to, any demand for mediation, arbitration or any other alternative dispute resolution process, or any request to toll or waive the statute of any limitations; |
| | (2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (a) service of a complaint or similar pleading; (b) return of an indictment, information or similar document (in the case of a criminal proceeding); or (c) receipt or filing of a notice of charges; |
| | (3) an administrative or regulatory investigation by the **EEOC**, which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to an **Insured**; or |
| | (4) an administrative or regulatory investigation of violations of the Uniformed Services Employment and Reemployment Rights Act when such investigation is conducted by the United States Department of Labor, Veterans Employment and Training Service, Justice Department |

A
I
G

O
L
0
6
:
s
e
s
s

6
3
/
2
5
/
2
0
1
9

or Office of Special Counsel and is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to an **Insured**.

However, in no event, shall the term "**Claim**" include any labor or grievance proceeding which is subject to a collective bargaining agreement.

| | |
|---|---|
| **Class Action Claim** | means any **Claim** brought: (1) by or on behalf of an actual or alleged class (whether or not certified as such); or (2) by the **EEOC** on behalf of any group of three or more complainants, plaintiffs or potentially aggrieved parties. |
| **Class Action Retention** | means the Retention applicable to **Loss** that arises out of a **Class Action Claim**. |
| **Defense Costs** | means reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including the cost of **E-Discovery Consultant Services** and premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and/or appeal of a **Claim** against an **Insured**. **Defense Costs** shall not include the compensation of any **Insured Person**. |
| **Designated Employment Practices Claim** | means a **Claim**: (1) alleging discrimination or **Retaliation**; or (2) that is a **Class Action Claim**. |
| **EEOC** | means the Equal Employment Opportunity Commission, or any similar state, local or foreign agency. |
| **Employee** | means any past, present or future employee, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal and temporary employee, in his or her capacity as such.  An individual who is leased to the **Organization** or is contracted to perform work for the **Organization**, or who is an independent contractor for the **Organization**, shall also be an **Employee**. |
| **Employment Practices Violation** | means any actual or alleged: |

(1) wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;

(2) harassment (including workplace bullying, sexual harassment whether "quid pro quo", hostile work environment or otherwise, including "same-sex" sexual harassment);

(3) discrimination (including, but not limited to, discrimination based upon age, gender, gender identity or expression, race, color, national origin, religion, sexual orientation or preference, genetic information, pregnancy, military status, employment status or disability);

(4) **Retaliation**;

(5) employment-related misrepresentation(s) to an **Employee** of any **Organization**;

(6)  employment-related libel, slander, humiliation, defamation or invasion of privacy;

A
I
G

O
L
0
6
:
s
e
s

6
3
/
2
5
/
2
0
1
9

(7)  false arrest or false imprisonment;

(8)  wrongful failure to employ or promote;

(9)  wrongful deprivation of career opportunity, wrongful demotion or negligent **Employee** evaluation, including the giving of negative or defamatory statements in connection with an employee reference;

(10) wrongful discipline;

(11) failure to grant tenure; or

(12) with respect to any of the foregoing items (1) through (11) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress or mental anguish, failure to provide or enforce adequate or consistent corporate policies and procedures, or violation of an individual's civil rights;

but only if the **Employment Practices Violation** relates to an **Employee** of or an applicant for employment with an **Organization** or an **Outside Entity**, whether committed directly, indirectly, intentionally or unintentionally.

| | |
|---|---|
| **Executive** | means any:<br><br>(1) *past, present and future duly elected or appointed director, officer,* trustee or governor of a corporation, management committee member of a joint venture or member of the management board of a limited liability company (or equivalent position), in his or her capacity as such; and<br><br>(2) past, present and future person in a duly elected or appointed position in an entity organized and operated in a **Foreign Jurisdiction** that is equivalent to an executive position listed in subparagraph (1) above, or a member of the senior-most executive body (including, but not limited to, a supervisory board), in his or her capacity as such. |
| **Financial Insolvency** | means: (1) the appointment by any government official, agency, commission, court or other governmental authority of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate an insolvent **Organization**; (2) the filing of a petition under the bankruptcy laws of the United States of America; or (3), as to both (1) or (2), any equivalent events outside the United States of America. |
| **Foreign Policy** | means the standard employment practices liability policy (including all mandatory endorsements, if any) approved by the **Insurer** or any of its affiliates to be sold within a **Foreign Jurisdiction** that provides coverage substantially similar to the coverage afforded under this **Coverage Section**. If more than one such policy exists, then "**Foreign Policy**" means the standard basic policy form most recently offered for sale for comparable risks by the **Insurer** or any of its affiliates in that **Foreign Jurisdiction**. |
| **Insured** | means any:<br><br>(1) **Insured Person**; or |

A
I
G

O
L
0
6
:
s
e
s
s

6
3
/
2
5
/
2
0
1
9

(2) **Organization.**

**Insured Person**       means any:

(1) **Executive** of an **Organization;**

(2) *Employee of an Organization; provided, however, an individual who is* leased to the **Organization** or is contracted to perform work for the **Organization,** or who is an independent contractor for the **Organization,** shall be an **Insured Person** only if the **Organization** provides indemnification to such individual in the same manner as is provided to the **Organization's** employees;  or

(3) **Outside Entity Executive.**

**Litigated Matter**     means any civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (1) service of a complaint or similar pleading; or (2) return of an indictment, information or similar document (in the case of a criminal proceeding).

**Loss**                 means damages, settlements, judgments (including back pay and front pay, pre/post-judgment interest on a covered judgment), and **Defense Costs;** however, **"Loss"** shall not include: (1) civil or criminal fines or penalties; (2) taxes; (3) any amounts for which an **Insured** is not financially liable or which are without legal recourse to an **Insured;** (4) employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation; (5) any liability or costs incurred by any Insured to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person; or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to a **Claim** alleging discrimination or other **Wrongful Act;** and (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed. **Defense Costs** shall be provided for items specifically excluded from **Loss** pursuant to subparagraphs (1) through (6) above of this Definition, subject to the other terms, conditions and exclusions of this policy.

**Loss** shall specifically include (subject to this policy's other terms, conditions and limitations, including but not limited to the Conduct Exclusion), punitive, exemplary and multiple damages (including the multiple or liquidated damages awards under the Age Discrimination in Employment Act and the Equal Pay Act). Enforceability of this paragraph shall be governed by such applicable law that most favors coverage for such penalties and punitive, exemplary and multiple damages.

**Loss** shall also include any attorney fees awarded to a prevailing plaintiff's counsel pursuant to a covered judgment against an **Insured** or which the **Insurer** has agreed to pay as part of a covered settlement of a **Claim** against an **Insured.**

**Management Control**   means:

115486 (6/13)                    15 of 17      © American International Group, Inc.  All rights reserved.

EPL COVERAGE SECTION

A
I
G

O
L
0
6
:
s
e
s
s

6
3
/
2
5
/
2
0
1
9

(1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; or the members of the management board of a limited liability company; or

(2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of an **Organization**, to elect, appoint or designate a majority of: the Board of Directors of a corporation; the management committee of a joint venture; or the management board of a limited liability company.

**Outside Entity**   means any: (1) not-for-profit entity; or (2) other entity listed as an "**Outside Entity**" in an endorsement attached to this **Coverage Section**.

**Outside Entity Executive**   means any: (1) **Executive** or **Employee** of an **Organization** who is or was acting at the specific request or direction of an **Organization** as an **Executive** of an **Outside Entity**, in his or her capacity as such; or (2) any other person listed as an **Outside Entity Executive** in an endorsement attached to this **Coverage Section**, in his or her capacity as such.

In the event of a disagreement between the **Organization** and an **Outside Entity Executive** as to whether such **Insured** was acting "at the specific request or direction of the **Organization**," this **Coverage Section** shall abide by the determination of the **Organization** on this issue and such determination shall be made by written notice to the **Insurer** within ninety (90) days after the **Claim** against such **Outside Entity Executive** is made. In the event no notice of any such determination is given to the **Insurer** within such period, this **Coverage Section** shall apply as if the **Organization** determined that such **Outside Entity Executive** was not acting at the **Organization's** specific request or direction.

**Prior AIG Policy**   means a valid and collectible employment practices liability policy providing substantially the same or similar coverage as is provided by this **Coverage Section**, issued to the **Name Entity** by the **Insurer** (or any other insurance company affiliate thereof), of which this **Coverage Section** is a continuous renewal.

**Related Claim**   means a **Claim** alleging, arising out of, based upon or attributable to any facts or **Wrongful Acts** that are the same as or related to those that were alleged in another **Claim** made against an **Insured**.

**Retaliation**   means a retaliatory act of an **Insured** alleged to be in response to the actual or attempted exercise by an **Employee** of the **Organization** or an **Outside Entity** of any right that such **Employee** has under law, including, without limitation, any of the following activities: (1) the disclosure or threat of disclosure by an **Employee** of the **Organization** or an **Outside Entity** to a superior or to any governmental agency of any act by an **Insured** which act is alleged to be a violation of any federal, state, local or foreign law, common or statutory, or any rule or regulation promulgated thereunder; (2) the exercise of rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law

A
I
G

O
L
0
6
:
s
e
s
s

6
3
/
2
5
/
2
0
1
9

relating to employee rights; (3) the filing of any claim under the Federal False Claims Act or any other federal, state, local or foreign "whistle-blower" law; or (4) strikes of an **Employee** of the **Organization** or an **Outside Entity**.

**Settlement Opportunity**

means an **Insurer** recommended settlement that is within the **Policy Aggregate** and the applicable **Separate Limit of Liability** or **Shared Limit of Liability**, and that is acceptable to the claimant.

**Subsidiary**

means:

(1) any for-profit entity of which the **Named Entity** has or had **Management Control** on or before the **Inception Date** of the policy either directly or indirectly through one or more of its other **Subsidiaries**; and

(2) any not-for-profit entity sponsored exclusively by an **Organization**.

A for-profit entity ceases to be a **Subsidiary** when the **Named Entity** no longer maintains **Management Control** of such entity either directly or indirectly through one or more of its **Subsidiaries**. A not-for-profit entity ceases to be a **Subsidiary** when such entity is no longer sponsored exclusively by an **Organization**.

**Third-Party Violation**

means any actual or alleged harassment or unlawful discrimination, as described in subparagraphs (2) and (3) of the definition of **Employment Practices Violation**, or the violation of the civil rights of an individual relating to such harassment or discrimination, when such acts are alleged to be committed against any individual other than an **Insured Person** or applicant for employment with the **Organization** or with an **Outside Entity**, including, but not limited to, students, patients, members, customers, vendors and suppliers.

**Third Party Retention**

means the Retention applicable to **Loss** that arises out of any **Third-Party Violation** alleging a **Third-Party Violation**.

**Wrongful Act**

means any **Employment Practices Violation**, **Third-Party Violation** or **Wrongful Internet Activity**.

**Wrongful Internet Activity**

means any actual or alleged:

(1) **Employment Practices Violation** alleged by an **Employee**; or

(2) **Third Party Violation**,

when committed by an **Employee** by means of the internet, including, but not limited to, social networking activities, regardless of whether such internet activity is during or after work hours or on or off the work premises. For purposes of the application of this definition, an individual shall be deemed to be an **Employee** regardless of whether such individual was acting in his or her capacity as an **Employee**.

# EXHIBIT "B"

Zatuchni & Associates, LLC
287 South Main Street
(Route 29)
Lambertville, New Jersey 08530
(609) 243-0300
Attorneys for Plaintiff
ID# 007811997

| | |
|---|---|
| MICHAEL FLAHERTY, | SUPERIOR COURT OF NEW JERSEY |
| | LAW DIVISION |
| Plaintiff, | MERCER COUNTY |
| | DOCKET NO.: |
| v. | |
| | CIVIL ACTION |
| MERCER COUNTY COMMUNITY | |
| COLLEGE; MONISE PRINCILUS; MARK | **COMPLAINT AND JURY DEMAND** |
| HARRIS, | |
| | |
| Defendants. | |

Plaintiff Mark Flaherty, by way of Complaint against Defendants Mercer County

Community College, Monise Princilus, and Mark Harris, states and alleges as follows:

<u>PARTIES</u>

1.    Plaintiff Michael Flaherty is a natural person residing at 277 Manor Boulevard,

Yardville, NJ 08620.  Mr. Flaherty is currently employed by Defendant Mercer County

Community College as the Commanding Officer for College Safety and Security.

2.    Defendant Mercer County Community College (hereafter "MCCC") is a two-year

public community college located at 1200 Old Trenton Road, West Windsor Township, New

Jersey 08550.

3.    At all relevant times, Defendant Monise Princilus was Executive Director of

Human Resources and Compliance for MCCC.  Upon information and belief, Ms. Princilus

resides in New Jersey.

4.     At all relevant times, Defendant Mark Harris was Vice President for Finance and Administration for MCCC.  Upon information and belief, Mr. Harris resides in New Jersey.

## INTRODUCTION

5.     Defendants maliciously targeted Plaintiff Michael Flaherty because he was a whistleblower regarding MCCC's ongoing violations of federal law governing the reporting and disclosure of crimes committed on campus and also disclosures and investigations of federal Title IX violations.

6.     Defendants engaged in this malicious targeting in an especially egregious manner. Defendants threatened and strong-armed a subordinate female employee into making a knowingly false complaint of sexual harassment against Mr. Flaherty, even though the female employee explicitly stated that she did not want to do so.  Defendants threatened the female employee into making a false complaint against Mr. Flaherty by telling her that MCCC would not investigate another sexual harassment complaint the female employee previously made against a co-worker unless she also made a complaint and implicated Mr. Flaherty in inappropriate sexual conduct.

7.     Defendants engaged in this outrageous and malicious conduct with the purpose of fashioning a pretext to terminate Mr. Flaherty and/or to destroy his reputation in retaliation for his protected conduct and to put a stop to Mr. Flaherty's whistleblowing.

8.     Defendants' unlawful and tortious scheme to target Mr. Flaherty through a false complaint of sexual harassment by a subordinate obtained by threats was only discovered when the female employee ultimately came forward and disclosed what had in fact occurred.

## BACKGROUND FACTS

9.     Plaintiff Michael Flaherty served for over twenty-three (23) years with the Trenton Police as both an officer and an investigator, attaining the rank of Captain.  He holds two

2

A
I
G

O
L
0
6
:
s
e
s
s
6

3
/
2
5
/
2
0
1
9

associates' degrees in Criminal Justice and has decades of experience in conducting criminal investigations.

10.   In or around 2011, Mr. Flaherty was hired by MCCC as Commanding Officer for College Safety and Security.  As Commanding Officer, Mr. Flaherty is responsible for overseeing and managing campus security operations, including security staff.  Among many other duties, Mr. Flaherty is responsible for conducting investigations and maintaining and reporting security-related records in compliance with state and federal law.

11.   Mr. Flaherty's direct supervisor was Director of College Safety Bryon Marshall.

12.   At all relevant times, Mr. Flaherty performed his job in an exemplary fashion, earning consistent superior performance reviews from Mr. Marshall.  Until the unlawful retaliation alleged below, Mr. Flaherty was never subject to reprimand or discipline.

13.   Upon his hiring, Mr. Flaherty assumed the duties of MCCC's Title IX Investigator. In this role, Mr. Flaherty was responsible for investigating student complaints of sexual misconduct, sexual harassment, and gender-related violence, as well as complaints of harassment, violence or discrimination based upon a protected class such as race.  In support of this role, Mr. Flaherty attended investigative training conducted by the Association of Title IX Administrators.

14.   Upon his hiring, Mr. Flaherty also assumed the responsibility of maintaining and reporting campus crime data in accordance with the federal Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act").  In support of this role, Mr. Flaherty attended training conducted by the Clery Center for Security on Campus.  He also assisted the then-Executive Director of Human Resources and MCCC's official Clery Compliance Officer, Jose Fernandez, in the preparation of the mandatory Annual Security Report ("ASR") for submission to the United States Department of Education.

15. The ensuing years brought significant staff changes at the administrative level at MCCC. In 2015, Dr. Jianping Wang became the new President of MCCC. In or around January of 2016, Mark Harris became VP of Finance and Administration, making Dr. Harris the head of MCCC's Human Resources Division.

16. Finally, in or around the Spring of 2016, Jose Fernandez resigned as the Executive Director of Human Resources. MCCC subsequently hired Sally Mercer to replace Mr. Fernandez in or around June or July of 2016.

### MR. FLAHERTY REPORTS AND COMPLAINS OF DEFICICIENCIES IN MCCC'S CLERY and TITLE IX COMPLIANCE

17. In or around the Summer or early Fall of 2016, Mr. Flaherty became aware that MCCC was not in compliance with certain requirements for its 2016 Clery ASR. Mr. Flaherty brought this fact to the attention of Dr. Harris and Ms. Mercer on more than one occasion in the Summer of 2016. He also brought it to the attention of President Wang, Dr. Harris, and Ms. Mercer in a meeting held in the first half of September 2016, during which the preparation of the ASR was discussed.

18. During the meeting, Mr. Flaherty communicated his reasonable belief that MCCC was in violation of certain Clery Act requirements, including, but not limited to, those involving the reporting of crime data, as well as education for students and staff regarding campus security and the prevention and awareness of sex offenses.

19. Mr. Flaherty made clear to all present that, although he would continue to assist Ms. Mercer in the preparation of the annual Clery Report, it was Ms. Mercer (like Mr. Hernandez before her) who was MCCC's official Clery Compliance Officer and who thus bore final responsibility for the report. Mr. Flaherty stated that the report had to be honest and truthful.

Case 3:19-cv-10217-FLW-LHG   Document 1-1   Filed 04/17/19   Page 44 of 56 PageID: 50
MER-L-000417-19   03/11/2019 4:57:01 PM   Pg 25 of 37   Trans ID: LCV2019438139

A
I
G

O
L
0
6
:
s
e
s

6

3
/
2
5
/
2
0
1
9

20.   Mr. Flaherty further explained to all present that his certification in the Clery Act was due to expire, and that given the significant changes the US Department of Education had recently made to the Act, he could not possibly assume the duties of Clery Compliance Officer without additional training.

21.   MCCC, however, ignored the reports and complaints of Clery Act violations raised by Mr. Flaherty during the September 2016 meeting, as well as subsequently.  Although Mr. Flaherty made requests for the necessary training to renew his Clery Act certification, they were denied by Dr. Harris.

22.   Additionally, shortly after the September 2016 meeting, Ms. Mercer abruptly resigned, leaving the Executive Director of Human Resources position vacant.  The position was to remain vacant through the end of 2016.  In the interim, Dr. Harris assumed Ms. Mercer's responsibilities, including those as Clery Compliance Officer.

23.   In November of 2016, Mr. Flaherty received a letter from Anthony Simeone, a Clery Compliance Specialist with the US Department of Education (the "DoE").  In his letter, Mr. Simeone stated that the DoE had reviewed MCCC's 2016 ASR and found it non-compliant with the Clery Act due to, among other violations, deficiencies in the reporting of certain crime data, as well as "information regarding the type and frequency of educational opportunities for students and employees about campus security . . . and programs designed to increase awareness of sex offenses."  These were the same deficiencies Mr. Flaherty had reported to the administration in September of 2016.

24.   On or around November 17, 2016, Mr. Flaherty attended a meeting to discuss the DoE's audit of the ASR and the deficiencies described in Mr. Simeone's letter.  Also in attendance were President Wang, Director of College Safety Bryon Marshall, Vice President for Student Affairs Diane Campbell, and Dr. Harris.

25. Shortly thereafter, Mr. Flaherty sent an email to President Wang memorializing the preceding events and stating: "[The DoE has] found several areas of non-compliance in our Clery report. I suspect these areas are the issues I brought forth to Sally Mercer and Dr. Harris back in August and September. We then meet [sic] with you on 9-11-16 and I again voiced my concerns . . . I spoke openly with Dr. Harris, Sally Mercer and yourself and I informed you that we were lacking in areas . . . [the DoE] is giving us until 11-30-16 to correct these issues and I do not have the expertise or the authority to institute these changes."

26. Contemporaneously, Mr. Flaherty relayed his concerns about MCCC's multiple violations of Clery Act requirements, as well as of Title IX, to Union representative Peter Fretwell. In November and December of 2016, both Mr. Fretwell and Mr. Flaherty communicated with each other and to DoE officials regarding MCCC's lack of compliance with both the Clery Act and Title IX.

27. In or around December of 2016, MCCC hired Monise Princilus to replace Jose Fernandez as Executive Director of Human Resources. Ms. Princilus was to begin work on January 1, 2017. Ms. Princilus was hired despite having no certification, training or depth of experience in Title IX or the Clery Act.

28. Also in early January 2017, Mr. Flaherty met Ms. Princilus for the first time, in the presence of Director Marshall. Ms. Princilus told Mr. Flaherty, quite brusquely, "I don't like lawyers and I don't like cops."

**THE ADAM WOOLF INCIDENT**

29. On or around February 7, 2017, student Adam Woolf, a registered sex offender, posed as a MCCC employee and thereby lured minors into a shower, where he exposed himself to them. Both the Division of College Safety and Security and the local West Windsor Police Department were involved in apprehending Woolf and in investigating the incident.

6

A
I
G

0
L
0
6
:
S
e
s
s
6
3
/
2
5
/
2
0
1
9

30.   The next day, February 8, 2017, Mr. Flaherty met with Dr. Harris and expressed his reasonable belief that unless MCCC immediately issued a Timely Warning regarding the Wolff incident to the campus community, MCCC would violate the Clery Act and/or Title IX. However, neither Dr. Harris nor any other administrator issued a Timely Warning at that time.

31.   In fact, MCCC did not ultimately issue a statement regarding the incident until days later, and only after receiving multiple press inquiries and press coverage, including news articles questioning whether the failure to report the incident was in fact a Clery Act violation.

## JENNIFER GODDARD'S COMPLAINT OF SEXUAL HARASSMENT AGAINST CO-WORKER MARTIN MORENO

32.   On or around December 29, 2016, while MCCC was closed for winter break, Mr. Flaherty received a complaint of harassment from one of his security officers, Jennifer Goddard. Specifically, Ms. Goddard informed Mr. Flaherty that another security officer, Martin Moreno, had texted her an inappropriate sexual request during the evening.  Mr. Flaherty responded that he would fully investigate Ms. Goddard's complaint when all parties involved had returned to work shortly after the New Year.

33.   On or around January 3, 2017, Mr. Flaherty conducted his investigation into Ms. Goddard's complaint against Mr. Moreno.  After interviewing the parties and examining all relevant evidence, Mr. Flaherty concluded his investigation.  As stated in his findings, he was unable to definitively determine that Mr. Moreno in fact sent Ms. Goddard the offending text message.  This was because Mr. Moreno represented that he was with friends on the night in question, and that one of his friends texted Ms. Goddard from Mr. Moreno's cell as a joke when Mr. Goddard left the cell unattended.

34.   At the conclusion of his investigation, Mr. Flaherty asked Ms. Goddard whether she desired to file a formal complaint against Mr. Moreno with Human Resources.  Ms. Goddard

7

A
I
G

O
L
0
6
:
S
e
s
s

6

3
/
2
5
/
2
0
1
9

responded that she wished to do so.  Accordingly, on or around January 4, 2017, Mr. Flaherty

forwarded his investigative report to Human Resources, which initiated a formal complaint on

Ms. Goddard's behalf.

**MS. PRINCILUS DEMANDS MS. GODDARD FILE A COMPLAINT OF
HARASSMENT AGAINST MR. FLAHERTY AS A CONDITION OF
PROCEEDING WITH HER COMPLAINT AGAINST OFFICER MORENO**

35.    In med February 2017, Ms. Goddard met with Ms. Princilus regarding her formal

complaint of harassment against Mr. Moreno.  During this meeting, Ms. Goddard mentioned in

passing that she had discussed workplace harassment with Mr. Flaherty in connection with her

complaint against Mr. Moreno.  Specifically, Ms. Goddard mentioned that Mr. Flaherty had

shared a story about a female officer who routinely engaged in sexually vulgar jokes, yet was

surprised and offended when her co-workers presented her with a sexually graphic birthday cake

in jest.

36.    As Ms. Goddard later confirmed to the Mercer County Prosecutor's Office in

August of 2017, she understood that Mr. Flaherty had relayed this anecdote to illustrate how an

individual's actions can cause others to misperceive that individual's tolerance or acceptance of

behaviors.  Ms. Goddard was not offended by the anecdote or by Mr. Flaherty's relaying of it in

any way.

37.    Also during her meeting with Ms. Princilus, Ms. Goddard mentioned in passing that

Mr. Flaherty had once told her that he had purchased contraception for his adult daughter.  This

comment arose during a discussion Ms. Goddard initiated with Mr. Flaherty regarding her

relationship with her father.  Again, as Ms. Goddard later confirmed to the Mercer County

Prosecutor's Office in August of 2017, she was not offended by the anecdote or by Mr. Flaherty's

relaying of it in any way.

A
I
G

O
L
0
6
:
s
e
s
s

6

3
/
2
5
/
2
0
1
9

38.   Nevertheless, Ms. Princilus then issued Ms. Goddard an ultimatum:  Unless Ms. Goddard also filed a formal complaint of sexual harassment against Mr. Flaherty, Ms. Princilus would refuse to proceed with and investigate Ms. Goddard's formal complaint against Mr. Moreno.  In other words, Ms. Princilus made Ms. Goddard's filing of an entirely bogus, fabricated and unrelated complaint of harassment against Mr. Flaherty a condition of Ms. Princilus moving forward on Ms. Goddard's complaint against Mr. Moreno.

39.   Ms. Princilus's ultimatum during the meeting of February 2017 is confirmed and proven by 1) Ms. Goddard's own testimony to the Mercer County Prosecutor's Office in August of 2017; 2) text messages by Ms. Goddard that were forwarded to Mr. Flaherty's possession by another MCCC employee; 3) statements by Ms. Goddard to Director Marshall, Dr. Harris, and Mr. Flaherty himself, several of which were recorded and preserved.

40.   Ms. Goddard had no desire to file a complaint against Mr. Flaherty and expressed so to Ms. Princilus.  In fact, she was so distressed by the thought of accusing Mr. Flaherty that she began to cry, yet Ms. Princilus continued to insist upon and pressure her for her compliance. Fearing that her complaint against Mr. Moreno would be dropped otherwise, Ms. Goddard reluctantly agreed to file a formal complaint of harassment against Mr. Flaherty, which she did on February 2017.

41.   Shortly thereafter, Ms. Princilus met with Mr. Flaherty and informed him that Ms. Goddard had filed a formal complaint of harassment against him.  Mr. Flaherty requested to review the complaint, but to his astonishment, Ms. Princilus refused to give him a hard or even an electronic copy of the document.  Instead, Ms. Princilus read the contents of Ms. Goddard's complaint aloud to Mr. Flaherty, refusing to allow him to take notes.  She then concluded the meeting by asking Mr. Flaherty to submit a written response.

42.    Accordingly, on February 22, 2017, Mr. Flaherty submitted a written response to Ms. Goddard's complaint to HR.  In his response, Mr. Flaherty provided context for his remarks to Ms. Goddard, demonstrating that they were in no way sexually graphic, crude or harassing in nature, but rather merely intended to address concerns that Ms. Goddard herself had raised.

## MS. PRINCILUS UNDERMINES TITLE IX INVESTIGATIONS, LEADING TO MR. FLAHERTY'S RESIGNATION AS TITLE IX INVESTIGATOR

43.    In February and March 2017, Ms. Princilus launched a campaign to thwart and undermine Mr. Flaherty in the execution of his duties as MCCC's Title IX Investigator.  As part of that campaign, Ms. Princilus directed that Mr. Flaherty would no longer initiate and conduct his own investigations when students or staff reported alleged Title IX infractions.  Instead, Ms. Princilus directed that, in the event of a reported Title IX violation, security staff were to hand the presumed victim or victims a "Title IX Questionnaire" form to complete and submit to HR. HR would then ostensibly review these questionnaires to determine whether Mr. Flaherty would be allowed to investigate the alleged incidents specifically as Title IX matters.

44.    Mr. Flaherty reasonably believed that refusing to investigate alleged instances of sexual assault/discrimination/harassment unless the presumed victim/victims completed a questionnaire was in violation of Title IX and/or a threat to the safety, health and welfare of the MCCC campus community.  Such methods were in direct contravention of all Mr. Flaherty's training and experience in conducting Title IX investigations.

45.    Accordingly, on March 10, 2017, Mr. Flaherty submitted an email to President Wang, resigning from his position as Title IX Investigator.  He stated: "I cannot comprehend how handing a victim of a heinous crime a form and telling them that they need to complete the form and wait for review before any action can be taken is in the best interest of all parties. Conducting an investigation in that manner goes against my training, ethics and morals.  I can't

10

A
I
G

O
L
0
6
:
S
e
s
6

3
/
2
5
/
2
0
1
9

in good moral conscious continue working as the Title IX investigator if the purpose is to discourage victims" and hamper the investigative process.

46.     In response, Mr. Flaherty received a letter from Dr. Harris confirming his resignation. In that letter, Dr. Harris curiously implied that Mr. Flaherty resigned due to the "stress" related to the Adam Woolf incident, rather than his objection to MCCC's handling of Title IX investigations.

47.     On or around March 21, 2017, Mr. Flaherty met with HR to discuss Ms. Goddard's complaint, as well as Mr. Flaherty's complaint. Monise Princilus, former employee Yolanda DeLoatch, and union representative Nancy Byrne were present. During the meeting, Ms. Princilus insisted on referring to Mr. Flaherty brusquely and dismissively as "Flaherty", while addressing everyone else by their proper names.

48.     Also on March 21, 2017, Mr. Flaherty clarified in a letter to Dr. Harris: "I cannot comprehend how providing a victim of a crime a form and waiting for their response is in the best interest of the victim or the college. <u>That is why I have resigned, it was in no way stress related</u>. (emphasis added)."

49.     Additionally, by letter to Dr. Harris dated March 28, 2017, Mr. Flaherty stated: "I feel that issues that I have brought forth that specifically deal with the mandates of Higher Education, the Dear Colleague Letter, and my training in Title IX have not been addressed and could potentially leave the college exposed to liability."

<b>MR. FLAHERTY LEARNS THAT THE "HARASSMENT" COMPLAINT<br>
AGAINST HIM WAS ORCHESTRATED BY DEFENDANT PRINCILUS, AND<br>
MS. PRINCILUS ISSUES MR. FLAHERTY A RETALIATORY AND BOGUS<br>
DISCIPLINARY MEMORANDUM</b>

50.     On or around March 29, 2017, Mr. Flaherty asked Dr. Harris as to the status of Ms. Goddard's complaint and his related complaint, and Dr. Harris responded that they had been

A
I
G

O
L
0
6
:
S
e
s
s
6

3
/
2
5
/
2
0
1
9

"resolved". However, over the next month, neither Ms. Princilus nor anyone from MCCC HR or administration contacted Mr. Flaherty to advise him of the outcome of the complaints.

51.    In or about mid-April 2017, Mr. Flaherty received a text exchange from a colleague that this person had with Ms. Goddard in which Ms. Goddard reveals that "Since I filed a formal complaint they made me put in a complaint against Mike Flaherty or they said they'd would drop the whole case." When queried about who "made" her put in a complaint against Mr. Flaherty, Ms. Goddard responded, "The head of HR."

52.    Receiving this email exchange in April 2017 was how and when Mr. Flaherty first learned that Ms. Goddard's "complaint" had in fact been orchestrated by Defendant Princilus.

53.    Ms. Princilus ultimately issued a memorandum on Ms. Goddard's and Mr. Flaherty's complaints on May 3, 2017. As to Ms. Goddard's complaint, the memorandum stated that Mr. Flaherty "admitted" to "making statements/comments of a sexual nature", without specifying the kind, degree or context of such comments. The memorandum further stated that Mr. Flaherty's conversations with Ms. Goddard were "in violation of College policy", without specifying a policy in particular. However, the memorandum directed Mr. Flaherty to review College policy on "harassment". The memorandum denied Mr. Flaherty's own complaint of retaliation as unsubstantiated.

54.    A copy of the memorandum concluding that Mr. Flaherty violated MCCC "policy" and directing him to review the college's harassment policy was placed in Mr. Flaherty's personnel file record.

55.    Importantly, nowhere in Ms. Princilus's memorandum does she state or refer to the fact that weeks prior, in April of 2017, Ms. Goddard withdrew her complaint against Mr. Flaherty. Ms. Princilus herself confirmed this withdrawal when she conferred with Mr. Flaherty regarding the memorandum on May 3, 2017.

12

A
I
G
O
L
0
6
:
S
e
s
s
6
3
/
2
5
/
2
0
1
9

56. Accordingly, on May 4, 2017, Mr. Flaherty emailed Ms. Princilus to request that she issue documentation (1) confirming Ms. Goddard withdrew her complaint against him; and (2) stating the reason why her complaint was withdrawn: "You indicated verbally that the matter is closed and that Officer Goddard has withdrawn her complaint. Upon review of the documentation that I was provided with it does not address or state that the matter was withdrawn. I am respectfully requesting additional documentation that clearly states the matter was withdrawn and I would like to know specifically why it was withdrawn."

57. By email dated May 5, 2017, Ms. Princilus denied Mr. Flaherty's request for documentation: "I can confirm the other party has withdrew [sic] her complaint. I am not aware of a policy that dictates that you are entitled to a reason(s)."

58. Subsequently, Defendants have continued to target and harass Mr. Flaherty on a near-weekly basis by delaying, intervening in, and obstructing his records requests relating to his appeal of Ms. Princilus's memorandum, as well as MCCC's recent reduction in his salary.

59. Defendant MCCC, through the arms of Defendants Princilus and Harris, have retaliated against and continue to retaliate against Mr. Flaherty for his repeated and well-documented complaints that MCCC violated the Clery Act, Title IX, and/or public policy relating to health, safety and welfare.

60. In response to Mr. Flaherty's whistle-blowing complaints, voiced both internally and externally, Defendants have targeted and continue to target Mr. Flaherty for termination by (1) forcing Mr. Flaherty's subordinate to file a completely fabricated charge of harassment against him; (2) denying Mr. Flaherty even a modicum of due process during Ms. Princilus's purported "investigation" of Ms. Goddard's complaint; (3) issuing a memorandum to Mr. Flaherty's personnel file indicating that he violated the college's harassment policy; and (4)

13

A
I
G

O
L
0
6
:
S
e
s
s
6

3
/
2
5
/
2
0
1
9

refusing to place any documentation in Mr. Flaherty's personnel file clarifying that the so-called complaint against him was withdrawn.

61. Defendants are in direct violation of the New Jersey Conscientious Employee Protection Act.

## COUNT I – VIOLATON OF CEPA

62. Plaintiff hereby incorporates and restates the allegations contained in the preceding Paragraphs as set forth at length herein.

63. Defendants subjected Mr. Flaherty to an adverse employment action in retaliation for protected whistle-blowing conduct in violation of the New Jersey Conscientious Employee Protect Act, N.J.S.A. 34:19-1 et seq. (CEPA).

64. As a result of Defendants' unlawful conduct, Mr. Flaherty has been subjected to job detriment and economic losses.

65. As a result of Defendants' unlawful conduct, Mr. Flaherty has been subjected to mental anguish, embarrassment, stress, anxiety, and humiliation and other pain and suffering.

WHEREFORE, Plaintiff demands the following damages and relief:

      a.    Judgment in favor of the plaintiff and against the defendants;

      b.    Compensatory damages;

      c.    Punitive damages;

      d.    Attorneys fees;

      e.    Costs of suit;

      f.    Reinstatement and any such additional relief as this Court deems just and equitable.

Respectfully submitted,

David Zatuchni, Esq.
Zatuchni & Associates, LLC
287 South Main Street
(Route 29)
Lambertville, NJ 08530
609-243-0300
Attorneys for Plaintiff

Dated: February 21, 2018

## CERTIFICATION PURSUANT TO R. 4:5-1

I hereby certify that this matter in controversy is not the subject of other actions pending in any court or arbitration proceedings, or any such contemplated other actions or arbitration proceedings.

David Zatuchni, Esq.
Zatuchni & Associates, LLC
287 South Main Street
(Route 29)
Lambertville, NJ 08530
609-243-0300
Attorneys for Plaintiff

Dated: February 21, 2018

15

A
I
G

O
L
0
6
:
s
e
s
6

3
/
2
5
/
2
0
1
9

## DESIGNATION OF TRIAL COUNSEL

David Zatuchni, Esq. is hereby designated as trial counsel in this matter.

David Zatuchni, Esq.
Zatuchni & Associates, LLC
287 South Main Street
(Route 29)
Lambertville, NJ 08530
609-243-0300
Attorneys for Plaintiff

Dated: February 21, 2018

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues and claims.

David Zatuchni, Esq.
Zatuchni & Associates, LLC
287 South Main Street
(Route 29)
Lambertville, NJ 08530
609-243-0300
Attorneys for Plaintiff

Dated: February 21, 2018

16

# Civil Case Information Statement

**Case Details: MERCER | Civil Part Docket# L-000373-18**

*Case Caption:* FLAHERTY MICHAEL  VS MERCER CTY.
COMMUNIT Y COLLE

**Case Initiation Date:** 02/21/2018

**Attorney Name:** DAVID ZATUCHNI

**Firm Name:** ZATUCHNI & ASSOCIATES, LLC

**Address:** 287 S MAIN ST
LAMBERTVILLE NJ 085300000

**Phone:**

**Name of Party:** PLAINTIFF : Flaherty, Michael

**Name of Defendant's Primary Insurance Company**
(if known): Unknown

*Case Type:* WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE
PROTECTION ACT (CEPA)

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Hurricane Sandy related?** NO

**Is this a professional malpractice case?**  NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same
transaction or occurrence)?** NO

---

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**
CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Employer/Employee

**Does the statute governing this case provide for payment of fees by the losing party?** YES

**Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
      **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
      **If yes, for what language:**

---

I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

02/21/2018
Dated

/s/ DAVID ZATUCHNI
Signed